RAY A. FOX, by and through his
guardian, ROSE FOX,

             Plaintiff,

       v.

ADMIRAL INSURANCE COMPANY,

             Defendant.

No. 12 CV 8740

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Ray Fox, through his guardian, sued the Illinois Department of Corrections and Wexford Health Sources, Inc. (IDOC's medical provider) for severe injuries he suffered while an inmate in the custody of IDOC. Admiral Insurance Company, Wexford's insurer, defended Wexford in the lawsuit and settled with Fox for $3 million to release two Wexford employees. This settlement did not include Wexford. Admiral informed Wexford that this settlement exhausted Wexford's insurance policy limits, and Admiral refused to contribute any additional money for a settlement for Wexford. Wexford then entered into a *Guillen*-type settlement with Fox, which included a consent judgment for $14 million. As part of the consent judgment, Fox agreed not to seek payment from Wexford, and Wexford assigned Fox its rights to seek insurance coverage or other remedies from Admiral.

In the present action, Fox wants Admiral to pay the $14 million consent judgment entered against Wexford in the earlier lawsuit. Fox and Admiral now bring cross-motions for summary judgment. Fox seeks to garnish insurance

coverage proceeds and to obtain the remainder of the consent judgment, contending that Admiral breached its duties to settle and to defend (leading Wexford to enter into a reasonable settlement with Fox). Admiral seeks summary judgment on those same claims, wanting to set off Fox's settlements with other defendants (which exceeded $14 million) and arguing that it did not breach its duties to Wexford and is not obligated to pay an allegedly collusive consent judgment.

For the following reasons, summary judgment for both parties is denied.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Background[1]

In 2007, Ray Fox was an inmate at the Northern Reception Center of Stateville Correctional Center, run by the Illinois Department of Corrections. Upon Fox's arrival at Stateville in late September 2007, Dr. Constantine Peters (the on-site medical director of the reception center) prescribed Fox medication for his seizure disorder. [141] ¶ 28; [144] ¶ 15; *Fox v. Barnes et al.*, Case No. 1:09-cv-05453, [220] at 2–4; *id.*, [349].[2] Fox began to run out of medication, despite repeated requests for assistance, and, by early October, he was vomiting and incontinent, and he had diarrhea and tremors. Fox was found unconscious in his cell and was transferred to the hospital on October 7, 2007. 1:09-cv-05453, [220] at 4–5; [141] ¶¶ 32, 34; [144] ¶ 16. He had suffered severe, permanent brain damage from a ruptured aneurysm, rendering him physically and mentally disabled, and unable to care for himself. 1:09-cv-05453, [220] at 5; [141] ¶ 32; [144] ¶¶ 17, 19. Fox's mother, Rose Fox, and his stepfather cared for Fox after his brain injury. [141] ¶¶ 37–38. In 2009, Rose Fox brought suit on Fox's behalf against IDOC, IDOC's health-care provider Wexford, and various employees of IDOC and Wexford, for deliberate

[1] Admiral objects that Fox's Local Rule 56.1 statement includes legal conclusions, lengthy paragraphs with multiple factual allegations, and, in places, lacks record citations and misconstrues exhibits. Fox makes similar objections to Admiral's LR 56.1 statement. Both parties' objections were noted in their responses to the LR 56.1 statements and were considered accordingly. The facts are taken largely from Admiral's response to Fox's LR 56.1 statement [141] and Fox's response to Admiral's LR 56.1 statement [144], a review of the record submitted by the parties, and relevant opinions and orders in the underlying action. Unless otherwise noted, the facts related are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by local rule.

[2] Bracketed numbers refer to entries on the district court docket in this case. Citations to the *Fox v. Barnes* docket are designated 1:09-cv-05453, [docket number].

indifference to his serious medical needs. *See* 1:09-cv-05453, [1], [25], [26], [49], [109]. Fox claimed that Wexford employees Dr. Peters and Nurse James Becker (who allegedly was assigned to give Fox his medication) were directly liable and that Wexford was liable via a *Monell* claim. Fox did not assert a claim for medical negligence. [144] ¶ 23.

Admiral insured Wexford from 1997 to 2008, with annual renewals. [141] ¶ 5; [144] ¶ 25. Upon Wexford's request for a defense, Admiral retained attorney Michael Charysh to defend Wexford and its employees. [144] ¶¶ 32–33. Trial was set for January 2012, but was rescheduled multiple times, finally occurring in January 2013. During the course of litigation, Admiral sent Wexford and its employees multiple reservation of rights letters. Most of these letters explained that Admiral was defending Wexford, Peters, and Becker against Fox's claims under the professional services liability coverage (coverage D) from the 2007–2008 policy. [141] ¶ 60; [132-7] at 5–14.[3]

In January 2012, about two weeks before the original trial date, Fox made an offer to settle all claims against Becker, Peters, and Wexford for $5.99 million. [141] ¶¶ 62, 71. Fox's counsel argued to Admiral and Wexford that Fox's claims straddled the policy periods for the 2006–2007 and 2007–2008 insurance policies (thereby providing sufficient coverage for the settlement amount), which Admiral disputed. Fox's reading of the insurance policies prompted Wexford to ask Admiral if there might be additional coverage, but Wexford did not follow up on this possibility until

---

[3] Admiral denies that these letters promised to indemnify the insureds under coverage D. [141] ¶ 60.

much later. [144] ¶ 45; [132-7] at 2, 20; [146] at 1. Admiral rejected the offer on Wexford's behalf. Several months later, in July 2012, Fox made another settlement offer to settle all three insureds: (1) Admiral would pay $3 million, (2) Becker and Peters would remain as parties but would be restricted from presenting evidence, testimony, or motions in limine, and (3) Wexford, Becker, and Peters would pay 10% of any jury award greater than $3 million. [141] ¶ 73. Admiral rejected the July offer on Wexford's behalf, although Fox claims that Wexford was not included in this decision. [141] ¶¶ 73–74, 77; [132-8] at 18.

In addition to defense counsel Charysh, Admiral had retained the services of another attorney, David Carlson, to negotiate a settlement with Fox. [144] ¶ 36. Dr. Peters was also interested in settlement and obtained independent counsel to demand that Admiral settle him out of the case. [144] ¶ 37; [132-6] at 29–30; [145-11] at 54–55. Eventually, in August 2012, Admiral informed Wexford that it intended to accept a settlement offer from Fox for $3 million to release Peters and Becker. Admiral said this payment exhausted limits of Wexford's coverage but offered to pay Wexford's defense through trial as a courtesy—Wexford, however, would be on its own after the trial. [141] ¶ 76; [144] ¶¶ 38–39. Fox, Admiral, Peters, and Becker agreed to the $3 million settlement, and Admiral paid the money. [144] ¶ 40.

Wexford retained its own attorney, Jill Berkeley, to discuss settlement with Fox's counsel. [144] ¶ 41. In October 2012, Fox made another settlement offer to Wexford for $3.3 million. Wexford demanded that Admiral contribute $3 million

towards this settlement, and Wexford offered to contribute $300,000 of its own money to meet the rest of the settlement demand. This was the first time Wexford argued that additional coverage (of at least $3 million) was still available to Wexford after the Becker-Peters settlement. [141] ¶¶ 78–79; [144] ¶¶ 44–45; [132-8] at 43. Admiral refused to pay, telling Wexford that the policy limits of $3 million were exhausted by the Becker-Peters settlement and (for the first time) that it was paying the Becker-Peters settlement under coverage B (personal injury liability coverage) for the 2007–2008 policy and not under coverage D (professional services liability coverage). [141] ¶ 63; [144] ¶ 46.

A few days after Admiral's refusal, Fox's and Wexford's attorneys began to discuss settlement, and within a day or so, they had reached an agreement to enter into a consent judgment for $14 million, together with a covenant not to execute and an assignment of rights. [144] ¶¶ 47–48. Fox agreed not to enforce the consent judgment against Wexford directly and received an assignment to pursue Wexford's claims against Admiral. The $14 million sum was first proposed by Fox's counsel, and Wexford did not make any counteroffer or try to negotiate the number down. Under the settlement terms, Wexford would never be held to the $14 million consent judgment. [144] ¶¶ 52–53. Fox allocated the $14 million to correspond with specific types of damages, mainly in order to avoid a setoff (that could reduce the potential award against the non-settling IDOC defendants), and Wexford agreed to those allocations without negotiation. [144] ¶¶ 56, 59. As part of the settlement and in order to avoid a setoff against later recoveries, Fox's counsel also asked Charysh

to change the unallocated Becker-Peters settlement into a payment specifically allocated to Fox's medical care from October 2007 to October 2012. [144] ¶¶ 66–67.

After Wexford settled, the case was tried against the IDOC defendants in January 2013. The jury found in favor of Fox against IDOC employee David Barnes for $11 million in compensatory damages and $1 million in punitive damages. Fox subsequently settled with Barnes for $11 million in compensatory damages and $1.43 million in fees and costs. [144] ¶¶ 9–10, 73–75. The Barnes settlement was not allocated, and Fox has recovered the Barnes settlement and the Becker-Peters settlement amounts, for a total of $15.43 million. [144] ¶ 76.

In the current action, Fox seeks to enforce the $14 million consent judgment against Admiral and brings claims for breach of contract (indemnification), bad faith failure to settle, vexatious and unreasonable conduct under 215 ILCS 5/155, and fraudulent inducement to settle.

III. **Analysis**[4]

A. **Choice of Law**

The insurance policies do not include a choice of law provision. Fox sees no conflicts of law, but believes that Illinois law should apply in the event of a conflict. Admiral argues that conflicts exist between Illinois and Pennsylvania law, and wants to apply Pennsylvania law. Federal courts sitting in diversity apply the forum state's choice-of-law analysis. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d

---

[4] Admiral did not comply with Local Rule 7.1, which requires that briefs exceeding 15 pages include a table of contents and table of authorities, or with the case management procedures for motions and memoranda of law, which request text-searchable PDFs. These rules and procedures are designed to assist the reader, and Admiral is directed to comply with the local rules in future filings.

674, 684 (7th Cir. 2014) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)). Under Illinois law, "[a] choice-of-law determination 'is required only when a difference in law will make a difference in the outcome,'" *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 2014 IL 116389, ¶ 14 (quoting *Townsend v. Sears, Roebuck & Co.*, 227 Ill.2d 147, 155 (2007)), and "[t]he party seeking the choice-of-law determination bears the burden of demonstrating a conflict." *Id.* Here, the burden is on Admiral to demonstrate a conflict of law that will make a difference in the outcome.

As one example of a conflict, Admiral argues that Pennsylvania law does not "automatically" construe policy ambiguities against insurers. But Illinois and Pennsylvania law do not conflict on this issue: both require ambiguous policy terms to be construed against the insurer, who drafted the policy. *See Pekin Ins. Co. v. Wilson*, 237 Ill.2d 446, 456 (2010); *compare 401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 583 Pa. 445, 455 (2005). In addition to this principle, Pennsylvania law permits consideration of the parties' negotiations and intentions. *Burns Mfg. Co. v. Boehm*, 467 Pa. 307, 313 n.3 (1976); *Prudential Ins. Co. of Am. v. Prusky*, 473 F.Supp.2d 629, 638–39 (E.D. Pa. 2007). This is not in conflict with Illinois law. *See, e.g., American Serv. Ins. v. Gray*, 2015 IL App (1st) 141161-U, ¶ 22.

Admiral also argues that Pennsylvania follows the "sophisticated insured rule" in *Prudential Insurance Co. v. Prusky*, 473 F.Supp.2d 629 (E.D. Pa. 2007), but Admiral does not explain the rule or how it applies to create a conflict in this case. In *Prusky*, the court would not automatically construe ambiguities against the

insurer because sophisticated insureds had taken an active role in the drafting process, providing a great deal of extrinsic evidence regarding the parties' intentions. 473 F.Supp.2d at 638–39. It might seem that Illinois law is in conflict because Illinois law strictly construes ambiguities against an insurer, even when the insured is a large and sophisticated entity, because "[g]enerally, since little or no negotiation occurs in this process, the insurer has total control of the terms and the drafting of the contract." *Farmers Auto. Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 978 (7th Cir. 2007) (quoting *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 122 (1992)). But, "[t]he [Illinois] rule presumably is limited by its logic, and hence to cases in which there is no negotiation over the terms of the insurance contract." *Id.* So Illinois law does not truly conflict with the holding of *Prusky*, which involved extensive negotiations over the terms of the insurance contract.

The final conflict that Admiral raises is that Pennsylvania law does not permit "creation" of insurance coverage by estoppel or waiver. This is a broad overstatement of Pennsylvania law. The principle is that "[u]nder Pennsylvania law, the doctrine of waiver or estoppel cannot create an insurance contract *where none existed*." *Pizzini v. Am. Int'l Specialty Lines Ins. Co.*, 210 F.Supp.2d 658, 674 (E.D. Pa. 2002) (emphasis added), *aff'd*, 107 Fed. App'x 266 (3d Cir. 2004). Illinois law is the same. *See Lytle v. Country Mut. Ins. Co.*, 2015 IL App (1st) 142169, ¶ 30 ("[T]he equitable principles of waiver and estoppel may not be used to create or extend coverage where none exists."). Thus, Admiral has not demonstrated an

applicable conflict between Pennsylvania and Illinois law. Where the law of the two states is essentially the same, courts apply the law of the forum state. *Railway Express Agency, Inc. v. Super Scale Models, Ltd.*, 934 F.2d 135, 139 (7th Cir. 1991). Illinois law applies.

### B. Garnishment

Fox wants to garnish remaining insurance coverage that was available to Wexford under the Admiral policies, thereby satisfying at least part of the $14 million consent judgment. Fox concedes that he may not use the garnishment action to recover damages in excess of the policy limits. [130] at 23–24. According to Fox, Admiral gave Wexford at least $6 million in coverage for the Fox case and possibly up to $9 million. Crediting Admiral for the $3 million Becker-Peters settlement, Fox argues that $3 million to $6 million in coverage remains available for garnishment.[5] Admiral, however, believes that only $3 million in coverage applied to Fox's underlying claims, which was exhausted by the Becker-Peters settlement.

Garnishment "is not a separate suit but an ancillary step in the original action." *Chandler v. Doherty*, 314 Ill.App.3d 320, 324 (4th Dist. 2000). "To be subject to garnishment, the indebtedness sought to be garnisheed must be a liquidated sum due without contingency." *Id*. As previously held in the underlying action, a policy-

---

[5] In the original action, Fox sought to garnish from Admiral the $14 million consent judgment between Wexford and Fox. 1:09-cv-05453, [406]. Admiral's motion to dismiss the garnishment action was denied because, under Illinois law, the fact that the amount due from the insurance company to the insured is in dispute does not preclude garnishment. 1:09-cv-05453, [417]. While garnishment is an ancillary proceeding to the judgment in 1:09-cv-05453, the viability of that claim is closely related to the claims in this case, and the parties have briefed it as part of the pending summary judgment motions. The older case is a closed case and is not currently assigned to an active judge of this court.

limit debt is not contingent or unliquidated merely because the parties disagree over the amount due. 1:09-cv-05453, [417] at 2; *see also Chandler*, 314 Ill.App.3d at 324. However, Fox's entitlement to garnish any remaining policy proceeds depends on whether Admiral is obligated to indemnify Fox (as Wexford's assignee) for Wexford's settlement and on whether that settlement was reasonable. *See, e.g., Murbach v. Noel*, 343 Ill.App.3d 644, 646–47 (2d Dist. 2003) (determining entitlement to garnishment by looking to insurer's duty to indemnify); *Guillen ex rel. Guillen v. Potomac Ins. Co. of Ill.*, 203 Ill.2d 141, 163 (2003) (A plaintiff must "prove that the settlement it reached with the insured was reasonable before that settlement can have any binding effect upon the insurer.").

## 1.    Duty to Indemnify

"The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 391 (1993). Both the 2006–2007 and 2007–2008 insurance policies include different categories of insurance coverage. Relevant here are the categories for personal injury liability coverage (coverage B) and professional services liability coverage (coverage D). Admiral believes that Fox's claims against Wexford and its employees only triggered $3 million in personal injury coverage B for the 2007–2008 policy, and the Becker-Peters settlement exhausted that coverage. In addition to this $3 million for 2007–2008 personal injury coverage B, Fox contends that his claims against Wexford also triggered $3

million in personal injury coverage B under the 2006–2007 policy and $3 million in professional services coverage D under the 2007–2008 policy.

In arguing the extent of coverage available to Wexford, both parties focus on the viability of Fox's claims against Wexford and its employees in the underlying action, essentially re-litigating that case all over again. This focus is misplaced. "[T]he duty to indemnify arises only where the insured becomes legally obligated to pay damages in the underlying action that gave rise to the policy claims, such as when the underlying parties settle." *Maryland Cas. Co. v. Dough Mgmt. Co.*, 2015 IL App (1st) 141520, ¶ 49; *National Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 724 (7th Cir. 2015). Because the parties settled instead of determining Wexford's liability at trial, the question is whether Fox's allegations in his underlying complaint fall under the provisions of either policy. *See Maryland Cas.*, 2015 IL App (1st) 141520, ¶¶ 49–53; *Artisan & Truckers*, 796 F.3d at 724 ("The pleadings, together with the terms of the policy, determine that duty [to indemnify].").

### 2.    The Insurance Policies

When construing insurance policies, "[a] court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Pekin*, 237 Ill.2d at 456. Unambiguous terms "must be given their plain and ordinary meaning" while ambiguous terms are "construed strictly against the insurer who drafted the policy." *Id.* at 455–56. "Whether an ambiguity exists turns on whether the policy language is subject to more than one reasonable interpretation. Although 'creative

possibilities' may be suggested, only reasonable interpretations will be considered."

*Hobbs v. Hartford Ins. Co. of the Midwest*, 214 Ill.2d 11, 17 (2005).

The relevant terms of the 2006–2007 and 2007–2008 policies are the same for both policy years. The operative policy period for the 2006–2007 policy was October 1, 2006 to September 30, 2007, and for the 2007–2008 policy was October 1, 2007 to September 30, 2008. [141] ¶ 24.

### a. *Long-Term Healthcare Facilities Professional Services Coverage (Coverage D)*

Both insurance policies provide a category of coverage for long-term healthcare facilities professional services liability (coverage D). Under the policy terms, professional services coverage applies to:

> [S]ums that the "insured" becomes legally obligated to pay as damages because of "bodily injury" to which this insurance applies, caused by a "medical incident" occurring in the course of performing professional services for your long-term healthcare facility. The "medical incident" must occur during the policy period.

[144] ¶ 9; [125] at 9, ¶ I.1. "Bodily injury" for professional services coverage D is defined as: "'bodily injury', sickness or disease sustained by any person that occurs during the policy period, including death at any time resulting therefrom." [125] at 10, ¶ V. "Medical incident" is defined as "any negligent act, error or omission in the furnising [sic] of professional services to any person, including: (a) the furnishing of health care services, including the furnishing of food, beverages, medications or appliances in connection with such services and the postmortem handling of human bodies." *Id*. All related negligent acts, errors, or omissions of professional health services towards one person are considered one "medical incident." *Id*. As Fox

13

concedes, the terms of coverage D require both the "medical incident" and the "bodily injury" to occur during the policy period. [141] ¶ 9. Admiral admits that both Wexford and its employees were defined as insureds for professional services coverage D. [141] ¶ 12.

Professional services coverage D for the 2007–2008 policy applied to Fox's claims against Wexford, Peters, and Becker. Fox's amended complaint included a § 1983 *Monell* claim against Wexford and § 1983 claims against Becker and Peters for deliberate indifference to his serious medical needs. Specifically, Fox alleged that Wexford maintained policies and procedures—promulgated by Dr. Peters and implemented by Wexford and IDOC employees—under which inmates with serious medical conditions were routinely denied access to necessary medication and medical care, and that this policy of deliberate indifference was a moving force behind his injury. 1:09-cv-05453, [109] ¶¶ 11, 40–48. Fox also alleged that Nurse Becker failed to provide him with medication or medical attention in the days leading up to his brain injury and hospitalization, despite Fox's urgent requests for medication and visible symptoms of illness. 1:09-cv-05453, [109] ¶¶ 14–25, 32–33. These allegations constitute a single "medical incident"—Wexford and its employees' related negligent acts or omissions in providing healthcare services and medication for Fox—that allegedly occurred during the 2007–2008 policy period and caused severe bodily injury in that same policy period. Therefore, professional

services coverage D under the 2007–2008 policy applies to Fox's claims against Wexford, Dr. Peters, and Nurse Becker.[6]

Admiral argues that because "medical incidents" are defined as negligent acts or omissions, only medical negligence or malpractice claims can be covered. Deliberate indifference is not medical malpractice, *see, e.g., Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011), and Fox did not assert a medical negligence or malpractice claim against Wexford or its employees. However, "[t]he deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose" and includes "'blatantly inappropriate' medical treatment." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). Nothing in coverage D specifically excludes coverage for professional medical services that are more than negligent and rise to the level of deliberate indifference. Coverage for deliberately indifferent provision of medical services, falling in between negligence and willfulness, is not clearly precluded by the terms of professional services coverage D, and therefore any doubt as to coverage must be resolved in favor of the insured. *Maryland Cas.*, 2015 IL App (1st) 141520, ¶ 51. Admiral acknowledges, moreover, that a civil rights exclusion—which would have precluded coverage for claims "arising out of willful violation of any penal statute or ordinance"—was deleted by endorsement, and therefore no longer excluded liability for civil rights claims otherwise covered by coverage D. [141] ¶¶ 10, 16; [140] at 7; [125] at 57. A

---

[6] Fox makes no argument that professional services coverage D for the 2006–2007 policy applies. Fox also makes no argument that there was more than one "medical incident" under coverage D.

reasonable reading of the contract is that civil rights violations involving medical misconduct more serious than negligence are covered.

Admiral has also waived its ability to assert non-coverage for professional services coverage D under the 2007–2008 policy. "[W]aiver is 'an equitable principle invoked to further the interests of justice whenever a party initially relinquishes a known right or acts in such manner as to warrant an inference of such relinquishment.'" *Lumbermen's Mut. Cas. Co. v. Sykes*, 384 Ill.App.3d 207, 219 (1st Dist. 2008) (quoting *Mollihan v. Stephany,* 52 Ill.App.3d 1034, 1041 (1st Dist. 1977)). An insurer waives a policy defense by continuing under a policy when it knew, or through ordinary diligence could have known, the facts in question giving rise to the defense. *Id.* at 223. As a unilateral act, detrimental reliance by the insured is not required to establish waiver. *Id.* at 219 (citing *Western Cas. & Sur. Co. v. Brochu,* 105 Ill.2d 486, 499 (1985)). "Strong proof is not required to show a waiver of a policy defense. Rather, the insured need only demonstrate such facts as would make it 'unjust, inequitable or unconscionable' to allow the insurer to assert the defense.'" *Id.* at 220.

Admiral waived its policy defense that coverage D only applies to medical malpractice claims by continuing to defend under coverage D after it knew that Fox was not asserting a malpractice claim. It was obvious by January 2010 (at the latest) that Fox was not asserting a claim for medical malpractice. [114] at 9; [144] ¶¶ 22–23; 1:09-cv-05453, [43] at 5. In multiple reservations of rights letters to Wexford and its employees, both before and after January 2010, Admiral

acknowledged that Fox's claims were based on deliberate indifference and explained that Admiral was defending Wexford and its employees under professional services coverage D for the 2007–2008 policy. [141] ¶ 60; [132-7] at 5–14. While these letters reserved other policy defenses (e.g., for damages in excess of the policy limits and for punitive damages), and did not promise indemnification under coverage D, none of the letters provided any indication that the category of coverage under the policies was in dispute or explained that professional services coverage D did not apply to cover both Wexford and its employees for Fox's deliberate indifference claims.[7]

Admiral points to a December 2011 reservation of rights letter that did not specifically reference professional services coverage D (or any other categories of coverage). [140] at 2–3; [141] ¶ 60; [145-11] at 34–35. But this letter did not contradict or repudiate Admiral's earlier letters specifically referencing professional services coverage D in connection with Fox's deliberate indifference claims. Moreover, multiple internal claim reports prepared by Admiral in 2012 listed the applicable coverage for the Fox case as "Professional Liability." [141] ¶¶ 57, 59; [132-6] at 29; [132-7] at 1. Admiral's actions were "inconsistent with any intention other than to waive" denial of coverage on the grounds that Fox was asserting

---

[7] Admiral is not saved from waiver by including in these letters a general non-waiver of defenses and a disclaimer that facts discovered during the course of litigation could preclude coverage. *Lumbermen's*, 384 Ill.App.3d at 226 ("An insurer's letter setting forth its nonwaiver of the issue of coverage is not, under all circumstances and conditions and at all times, a shield against responsibility to an insured."). Under the circumstances, it would be "unjust, inequitable or unconscionable," *id*. at 220, to allow Admiral to assert non-coverage because Fox brought a deliberate indifference claim when it continually represented to its insureds that it was defending Fox's deliberate indifference claims under professional services coverage D.

deliberate indifference claims rather than medical malpractice claims. *Lumbermen's*, 384 Ill.App.3d at 219.[8]

### b. *Personal Injury Liability Coverage (Coverage B)*

Both insurance policies also provide a category of coverage for "personal and advertising injury" liability (coverage B). The personal injury liability coverage B provisions state:

> This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

[141] ¶ 18; [125] at 24, ¶ 1.b. This language is clear and unambiguous: personal injury coverage B is activated by an "offense" committed during the relevant policy period (as compared to a "medical incident" for professional services coverage D).

The policies further define "personal and advertising injury" as: "injury, including consequential 'bodily injury', arising out of one or more of the following offenses," including:

> Deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States of America or the state of which the Named Insured may be held liable to the party injured in any action at law suit in equity, or other property proceedings for redress including suits brought pursuant to 42 USCS [sic] 1983 and 1988.

[141] ¶ 14; [125] at 32, ¶ 14; *id.* at 42, ¶ 14.h.[9] This language is unambiguous that covered offenses include § 1983 civil rights violations.

---

[8] Based on this construction of the policy and Admiral's waiver, there is no need to decide Fox's estoppel argument.

Coverage D and personal injury coverage B define "bodily injury" and covered insureds differently. Unlike coverage D, "bodily injury" for coverage B does not require bodily injury to occur during the policy period: "[b]odily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." [125] at 30, ¶ V.3. *See, e.g., 9 Couch on Ins.* § 129:8 ("Because personal injury coverage applies to injury which arises out of the commission of certain enumerated acts or offenses, personal injury coverage is triggered by the commission of the offense, not the injury or damage suffered."). And unlike professional services coverage D, personal injury coverage B includes Wexford but specifically excludes as insureds employees who cause bodily injury "arising out of his or her providing or failing to provide professional health care services." [141] ¶¶ 14–15; [125] at 27, ¶¶ II.1.d, II.2.a(1)(d).[10]

Wexford was covered for Fox's *Monell* claim under personal injury coverage B for both the 2006–2007 and 2007–2008 policies. Personal injury coverage B applies to an "offense," including a "deprivation" of civil rights "of which the Named Insured may be held liable," and Fox alleged civil rights violations during both policy periods. Fox alleged that Wexford deprived him of his Eighth Amendment rights

---

[9] Civil rights violations were included as "offenses" by endorsement. [141] ¶ 14; [125] at 42.

[10] Fox admits that this excludes Dr. Peters and Nurse Becker as insureds for personal injury liability coverage B. [130] at 24. Admiral argues (and argued back in October 2012) that the sole coverage available for Wexford, Becker, and Peters was 2007–2008 personal injury coverage B, which was exhausted by the Becker-Peters settlement. *See, e.g.,* [141] ¶¶ 16, 86; [114] at 8–9, 13. By taking the position in October 2012 that personal injury coverage B included Dr. Peters and Nurse Becker as insureds, Admiral has waived its right to enforce the 2007–2008 policy provisions excluding employees providing professional healthcare services as insureds for personal injury liability coverage B. *Lumbermen's*, 384 Ill.App.3d at 219–20.

from September 24, 2007 through October 7, 2007, when its policies (and the actions of its alleged final policymaker, Dr. Peters) exposed Fox to a substantial risk of harm, and that this harm manifested in early October—e.g., vomiting, headaches, diarrhea, tremors, incontinence—eventually resulting in Fox being rendered unconscious and bleeding in his cell. Allegedly, Wexford's policies and procedures were promulgated by Dr. Peters, who prescribed Fox an insufficient amount of anti-seizure medication on September 24, 2007. 1:09-cv-05453, [109] ¶¶ 11, 13–18, 32–33; [144] ¶ 21.[11] And during and prior to October 7, 2007, Wexford allegedly maintained policies or procedures under which its employees commonly failed to properly examine or provide prescription medication to inmates with a serious medical condition, and under which its employees routinely ignored inmates requesting medical care or exhibiting obvious signs of a serious medical condition. 1:09-cv-05453, [109] ¶¶ 40–48.

Fox's complaint alleges *Monell* liability by alleging "a series of acts violative of constitutional rights." *Powe v. City of Chicago,* 664 F.2d 639, 651 (7th Cir. 1981); *see Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978). Each alleged violative act during September 2007 through October 2007 was a deprivation of Fox's civil rights, and therefore an "offense" under personal injury

---

[11] A *Monell* policy or custom may include an allegation that the constitutional injury was caused by someone with final policy-making authority. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Although Admiral argues that Dr. Peters was not Wexford's final policymaker at the Stateville Northern Reception Center, what matters are the allegations in Fox's complaint. Moreover, in pretrial rulings, the court had determined that Dr. Peters was the final policymaker for Wexford. 1:09-cv-05453, [349]; *id.*, [376] at 1.

coverage B.[12] Because the terms of personal injury coverage B do not require "bodily injury" to occur in the same policy period as the civil rights offense (unlike "bodily injury" and "medical incident" in coverage D) and because Fox's alleged civil rights deprivations occurred during both policy periods, both policies apply to Fox's *Monell* claim against Wexford.[13]

Admiral argues Fox's *Monell* claim cannot straddle both periods because Fox's physical injuries did not occur until he ran out of medication around October 3rd or 4th. [114] at 12; [144] ¶ 16. Admiral, citing several malicious prosecution cases, argues that a civil rights offense does not trigger insurance coverage until the injurious effects of the offense are apparent. *See National Cas. Co. v. McFatridge*, 604 F.3d 335 (7th Cir. 2010); *Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124 (7th Cir. 2012); *American Safety Cas. Ins. Co. v. City of Waukegan, Ill.*, 678 F.3d 475

[12] There is an argument that, under *Monell*, Wexford's liability is premised on a single custom or policy of not providing appropriate medical care, which could be a single "offense" occurring in only one policy period. *See, e.g., Mead Reins. v. Granite State Ins. Co.*, 873 F.2d 1185, 1187–88 (9th Cir. 1988); *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982). However, *Mead* and *Appalachian* involved substantially different policy terms and are distinguishable. Unlike the Admiral policies, which define an "offense" as a civil rights deprivation, the respective insurance policies in *Mead* and *Appalachian* specifically defined the triggering term "occurrence" so that a single "occurrence" included repeated exposure to harm or an ongoing harmful condition. *Mead*, 873 F.2d at 1187; *Appalachian*, 676 F.2d at 61. The definition of "offense" in the Admiral policies does not include such language.

[13] Admiral cites different rulings in the underlying action to argue that the court held that Fox suffered only one constitutional injury. [114] at 9; [144] ¶¶ 18, 24. The court never made this specific ruling. The cited language is taken out of context from: (1) a ruling that Fox's claims were not founded on a "separate transaction or occurrence" under Federal Rule of Civil Procedure 10; and (2) the denial of Barnes's post-trial motion for setoff, which held that, because it was impossible to apportion liability for Fox's injuries among the IDOC and Wexford defendants, the failure to provide Fox with medical care was a single, indivisible injury for the purposes of joint and several liability. 1:09-cv-05453, [43] at 3–4; *id.*, [490] at 9–10. Neither of these decisions applied the policy language concerning "offense" and "bodily injury" under coverage B.

(7th Cir. 2012); *Indian Harbor Ins. Co. v. City of Waukegan*, 2015 IL App (2d) 140293; *County of McLean v. States Self-Insurers Risk Retention Grp., Inc.*, 2015 IL App (4th) 140628. These cases note "the unique nature of malicious-prosecution claims for purposes of determining insurance coverage," *County of McLean*, 2015 IL App (4th) 140628, ¶ 38, so are of little value here. In any event, when applied to a deliberate indifference *Monell* claim, the cases do not support Admiral.

The Seventh Circuit and Illinois state courts treat malicious prosecution trigger dates for insurance coverage differently.[14] The Seventh Circuit focuses on the date of tort accrual to determine the trigger date, *see, e.g., McFatridge*, 604 F.3d at 344, while the Illinois courts focus on the parties' intent, as determined by the policy language, *see, e.g., Indian Harbor*, 2015 IL App (2d) 140293, ¶¶ 15–17. It is not the fact that an injury became apparent that is decisive; it is the legal consequence of that fact as a matter of tort accrual or policy interpretation that determines the trigger date for coverage.

Applying either approach to Fox's *Monell* allegations and coverage B gives the same result—both years were triggered. Fox alleged that in September 2007, Dr. Peters (Wexford's policymaker) prescribed an insufficient amount of anti-seizure medication. [114] at 12; 1:09-cv-05453, [109] ¶¶ 11, 13–14, 32–33; [144] ¶ 21. Accordingly, the alleged *Monell* violation accrued in September 2007, when Fox was

---

[14] *See, e.g., Northfield Ins.*, 701 F.3d at 1130 ("[W]e held in *McFatridge* and *American Safety* that the trigger date for a malicious prosecution claim occurs on the day of exoneration."); *compare Indian Harbor*, 2015 IL App (2d) 140293, ¶¶ 15–36 (distinguishing *McFatridge* and *American Safety* and holding that the trigger date for malicious prosecution claim is the commencement of a malicious prosecution, not exoneration); *County of McLean*, 2015 IL App (4th) 140628, ¶¶ 35–39 (concurring with *Indian Harbor*).

allegedly exposed to "a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 828 (1994), even if Fox would have only been entitled to nominal damages at that point. Each additional deprivation of medication and medical care under Wexford's alleged policies, eventually resulting in Fox's severe and permanent brain damage in October 2007, "marked a fresh infliction of punishment[.]" *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001).[15] Pursuant to the language of personal injury coverage B, each of the civil rights deprivations during September through October 2007 was an "offense" triggering coverage. And since coverage B does not require "bodily injury" to occur in the same policy period as the offense, both policies apply to Fox's *Monell* claim against Wexford.

In summary, based on the allegations in Fox's underlying complaint and the terms of the insurance policies, Wexford had coverage for Fox's *Monell* claims under personal injury coverage B for both policy years and professional services coverage D under the 2007–2008 policy.

### c. *Coverage Limits*

For each policy year, personal injury liability coverage B is subject to a limit of $3 million per offense and a $10 million aggregate limit (shared with coverages A and C, which are not at issue). Professional services coverage D is subject to a limit of $3 million per medical incident and $10 million aggregate. [144] ¶ 26. The policy aggregate limit for all claims was $20 million per year. [141] ¶ 20. The policies also include a non-stacking endorsement:

---

[15] The continued infliction of punishment prevented the statute of limitations from running even though a completed tort had accrued.

> If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "occurrence" and / or "medical incident" the maximum applicable per "occurrence" and / or "medical incident" aggregate Limits of Insurance available under all the Coverage Parts or policies combined shall not exceed the combined highest applicable per "occurrence" and / or "medical incident" aggregate Limits of Insurance under any one coverage part or policy as stated on the Declarations page of this policy.

[141] ¶ 21; [144] ¶ 29; [125] at 6, 18. Admiral argues that this non-stacking endorsement was intended to limit coverage to $3 million for any injury covered under multiple coverage categories. Fox argues that this non-stacking endorsement prevented stacking the aggregate $10 million limits of insurance coverage—i.e., so that Wexford's total coverage for one occurrence or medical incident (to which multiple coverages might apply) would be capped at a $10 million aggregate limit instead of the annual $20 million policy aggregate limit.

Whether an insurance policy permits stacking is a legal issue, and anti-stacking clauses will be given effect if unambiguous. *Hobbs,* 214 Ill.2d at 17–18. The policies' non-stacking endorsement clearly refers to applicable "aggregate" limits. Admiral has not provided a reasonable interpretation to explain how "aggregate" limits could mean "non-aggregate" limits, and the deposition testimony cited in its LR 56.1 statement does not clearly show that Admiral, Wexford, and their insurance brokers shared an understanding that the non-stacking endorsement limited Wexford to a maximum of $3 million of coverage for any given claim. Even if the provision were ambiguous, the ambiguity would be construed against Admiral.

*Pekin*, 237 Ill.2d at 456. Therefore, this non-stacking endorsement applies to prevent stacking multiple aggregate limits (essentially limiting Wexford's coverage for the same occurrence or medical incident to a $10 million aggregate), but does not limit Wexford to a single $3 million limit for any given claim if multiple coverage categories apply.

As written, the policies also do not prevent stacking personal injury liability coverage B from two policy years. The provisions outlining the limits of insurance for personal injury coverage B state that the personal injury limit (of $3 million) "is the most we will pay under Coverage B for the sum of all damages because of all 'personal and advertising injury' sustained by any one person or organization" but that coverage B limits "apply separately to each consecutive annual period." [141] ¶ 25; [125] at 6; *id*. at 28, ¶ III.4. So the policies do not preclude stacking personal injury coverage B from different policy periods, but they do limit the personal injury recovery to $3 million per person, per policy period, even if there were multiple alleged civil rights offenses during that period.[16]

In summary, Wexford was covered for the alleged September 2007 *Monell* violations under coverage B of the 2006–2007 policy (up to its $3 million limit), and Wexford was covered for the October 2007 *Monell* violations under two categories of coverage from the 2007–2008 policy: (1) coverage B (up to a $3 million limit) and (2)

---

[16] Admiral has admitted that it did not intend the non-stacking of limits endorsement to prevent stacking of limits across policy periods. [121] at 53, ¶ 26. But Admiral argues that multiple policies can be triggered only in special circumstances. [114] at 13. This doctrine does not apply here because the construction of the policies in this case is based on the text and resort to interpretive principles developed in asbestos or malicious prosecution cases is unnecessary.

coverage D, which was limited to $3 million because all related negligent acts (including Becker's and Peters's alleged deliberate indifference) were considered one "medical incident." There was therefore a total of $9 million in available coverage as to Fox's claims.

Admiral has already paid Fox $3 million for the Becker-Peters settlement (and since October 2012, Admiral has taken the position that this was paid under personal injury coverage B of the 2007–2008 policy). This means that for the Fox case, Wexford still had available $6 million in coverage: $3 million from 2006–2007 personal injury coverage B and $3 million from 2007–2008 professional services coverage D.[17]

For each policy year, Admiral's obligation to indemnify Wexford was capped at $20 million in the aggregate for all claims. [144] ¶¶ 26, 29; [125] at 6, 18. During each policy period, other settlements and judgments against Wexford chipped away at the $20 million cap, but more than enough remained to indemnify Wexford for the full limits of its coverage under either policy period, as there was $8.3 million remaining (out of the $20 million) for the 2006–2007 policy and $6.25 million remaining for the 2007–2008 policy (even accounting for the $3 million Becker-Peters settlement). [141] ¶ 26.

Fox is not entitled to garnish that $6 million from Admiral pursuant to the consent judgment until Fox establishes that Wexford's settlement (including the

_____

[17] Alternatively, if the $3 million for the Becker-Peters settlement had been paid under the 2007–2008 professional services coverage D, Wexford would still have had $6 million in coverage remaining under the personal injury coverage B for the 2006–2007 and 2007–2008 policies.

consent judgment) was reasonable. *See Guillen*, 203 Ill.2d at 163 (A plaintiff must "prove that the settlement it reached with the insured was reasonable before that settlement can have any binding effect upon the insurer.").

### C.  *Guillen* Settlement

In a *Guillen*-type settlement, when an insurer breaches its duty to defend, the insured may enter into a reasonable settlement agreement without foregoing its right to seek indemnification. *Guillen*, 203 Ill.2d at 158. Fox argues that Admiral breached its duty to defend by preemptively refusing to defend Wexford in any post-trial activities and that Wexford settled in reasonable anticipation of liability and for an amount within the range of possible damages at trial. Admiral believes there was no breach of the duty to defend and that Wexford colluded with Fox to create a windfall settlement protected from a setoff.

#### 1.  Duty to Defend

"[I]n the absence of a breach of the duty to defend, an insured must obtain the consent of the insurer before settling with an injured plaintiff." *Guillen*, 203 Ill.2d at 149. The policies unambiguously provide that Admiral's duty to defend ends when the applicable limits of liability have been exhausted by payment of judgments or settlements. [125] at 9, ¶ I.1; *id*. at 24, ¶ 1.a(2). When "an insurer has properly exhausted its policy limits by the payment of judgments and/or settlements, it is no longer obligated to defend any actions against" the insured. *Zurich Ins. Co. v. Raymark Indus., Inc.*, 118 Ill.2d 23, 53 (1987).

It is undisputed that after Admiral accepted the Becker-Peters settlement in August 2012, Admiral refused to defend Wexford for any potential post-trial

remedies or an appeal but it offered to defend Wexford through the upcoming trial as a "courtesy," even though Admiral considered the policy limits exhausted. [141] ¶ 76; [144] ¶¶ 4, 39. When an insurance contract provides a duty to defend, whether an insurer is obligated to pursue post-trial remedies "must be resolved in the context of the duty of good faith and fair dealing owed by the insurer to its insured," which requires an insurer to pursue post-trial remedies "in circumstances where reasonable grounds are present." *Illinois Founders Ins. Co. v. Guidish*, 248 Ill.App.3d 116, 122 (1st Dist. 1993); *see also Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 359 Ill.App.3d 872, 891 (2005), *aff'd* 223 Ill.2d 352 (2006). The $3 million Becker-Peters settlement did not exhaust the policy limits (for the reasons discussed above), and Admiral was not yet excused from its duty to defend Wexford. Under these circumstances, Admiral's wholesale refusal to defend Wexford in any post-trial activity—a refusal made before a trial had even occurred—was a breach of Admiral's duty to defend.[18]

### 2. Reasonableness of the Settlement

But the reasonableness of Wexford's settlement with Fox cannot be determined at summary judgment.

Admiral contends that Wexford unreasonably decided to settle and suggests that, as a *Monell* defendant not subject to respondeat superior liability, Wexford may have preferred to try the case. If Wexford had proceeded to trial in lieu of

---

[18] At the time of Admiral's refusal, Wexford had not yet demanded additional coverage from Admiral. Instead, Wexford waited several weeks later until October 2012. [144] ¶ 45. It may seem odd to say that Admiral breached its duty to defend before Wexford began arguing it was entitled additional coverage, but the fact remains that the policy limits were not yet exhausted.

settling, it also likely would have been entitled to set off prior settlements (e.g., the $3 million Becker-Peters settlement) from any adverse judgment against it. Admiral believes Wexford colluded with Fox by agreeing to $14 million without making a counteroffer or contesting the bases for settlement allocations. Fox, however, argues that the $14 million settlement is reasonable as a matter of law because Wexford settled in reasonable anticipation of liability and while facing potential trial damages far in excess of policy limits, given the strength of Fox's claims against Wexford and the severity of his injuries.

Fox must prove that the settlement he reached with Wexford was reasonable. *Guillen*, 203 Ill.2d at 163. This burden is "properly placed on the plaintiff both out of fairness, since the plaintiff was the one who agreed to the settlement, and out of practicality, since, as between the plaintiff and the insurer, the plaintiff will have better access to the facts bearing upon the reasonableness of the settlement." *Id*. at 163–64. The insurer retains the right to rebut any preliminary showing of reasonableness with its own affirmative evidence bearing on the reasonableness of the settlement agreement. *Id*. at 164.

Whether an insured's decision to settle was reasonable is tested by considering, under the totality of the circumstances, whether the insured's decision "conformed to the standard of a prudent *uninsured*." *Guillen*, 203 Ill.2d at 163. Under the prudent uninsured test, the hypothetical uninsured defendant "has assets sufficient to satisfy a substantial judgment" but "must weigh whether those assets are best put to use litigating certain issues that could lower the value of the

case or whether an early settlement, presumably at a discount, is more advantageous." *Central Mut. Ins. Co. v. Tracy's Treasures, Inc.*, 2014 IL App (1st) 123339, ¶ 64.

Whether the amount of the settlement was reasonable is tested by "what a reasonably prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim," considering the totality of facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial. *Guillen*, 203 Ill.2d at 163. Relevant factors include whether the amount was the product of arm's length negotiations, what facts were available to Wexford to reliably value Fox's claims, and Wexford's analysis of the viability of its defense at trial. *Tracy's Treasures*, 2014 IL App (1st) 123339, ¶ 75.

A settlement amount may also be deemed unreasonable if there is evidence of bad faith, collusion, or fraud. *Id.* ¶ 79. Although "[a]ny negotiated settlement involves cooperation to a degree," a settlement "becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party." *Id.* ¶ 80. The indicators of bad faith and collusion "have in common unfairness to the insurer," *id.*, and can include unreasonableness, misrepresentation, concealment, lack of serious negotiations on damages, attempts to affect the insurance coverage, attempts to harm the interest of the insurer, the overall settlement in light of the value of the case, a comparison with awards or verdicts in similar cases in involving similar injuries, the facts known to the settling insured at the time of settlement, the presence of a covenant not to execute as part of the settlement, and the failure of

the settling insured to consider viable available defenses. *Id*. ¶¶ 80–81. Allocation manipulation can also be evidence of bad faith, but is not necessarily dispositive. *Johnson v. Belleville Radiologists, Ltd.*, 221 Ill.App.3d 100, 109–10 (5th Dist. 1991).

With these principles in mind, the consent judgment may be unreasonable. The negotiations surrounding the consent judgment were speedy and excluded Admiral, even though the settlement was clearly intended to target Admiral's pocket. In October 2012, Wexford received advance notice of a forthcoming $3.3 million settlement demand, without telling Admiral. Wexford waited until after Fox's settlement offer was made to demand Admiral pay another $3 million, and Admiral refused. Subsequently, Fox's and Wexford's outside counsel, Berkeley, discussed the consent judgment, assignment of rights, and settlement, purposefully excluding Admiral from the negotiations. [144] ¶¶ 46–48, 54–55. Within one day of beginning their discussions, Fox and Wexford had agreed to enter into a consent judgment for $14 million, together with a covenant not to execute and an assignment of rights.[19] [144] ¶ 48. Charysh, Wexford's trial counsel, was not told about these settlement discussions until the deal was struck in principle. He was then instructed by Wexford to not inform Admiral about the settlement, and he did not do so. [144] ¶ 54; [123] at 13–14. Admiral's claim superintendent was not

_____

[19] Admiral argues that Fox's willingness to settle against Wexford for $3.3 million in early October 2012 weighs against finding that Wexford's decision to settle with Fox for $14 million in mid-October 2012 was reasonable, especially when the parties agree that nothing of substance occurred in the underlying lawsuit during that time. [144] ¶ 49. Federal Rule of Evidence 408 prohibits use of settlement offers and negotiations to prove or disprove the amount of a disputed claim. The earlier $3.3 million settlement offer is admissible to establish the circumstances surrounding the consent judgment, but is not admissible to prove or disprove the reasonableness of $14 million as the value of Fox's claims.

informed of Wexford's settlement with Fox until October 22, 2012, about five days after Fox and Wexford agreed on terms. [144] ¶ 55. The consent judgment was filed a few days later. [144] ¶ 60.

Fox agreed not to enforce the consent judgment against Wexford directly and instead received an assignment to pursue Wexford's claims against Admiral. [141] ¶ 82; [144] ¶¶ 48, 51. By the settlement terms, under no circumstances could Wexford be held to the $14 million amount. The $14 million sum was the amount first proposed by Fox's counsel, and Wexford did not make any counteroffer or try to negotiate the number down. [144] ¶¶ 52–53. It is undisputed that, from Wexford's perspective, the dollar amount of the judgment, allocated or not, was not significant; there is no evidence that Wexford would have agreed to a settlement of this magnitude without a covenant not to execute. [144] ¶¶ 59, 65. The lack of any real effort by an insured to limit the settlement amount can raise an issue of fact, and the existence of a covenant not to execute can indicate bad faith. *Tracy's Treasures*, 2014 IL App (1st) 123339, ¶¶ 81–82.

Misrepresentations and concealment can also be evidence of a collusive settlement. *Id.* ¶ 81. Wexford concealed the settlement discussions and settlement agreement from Admiral for several days. Wexford also represented in the consent judgment that it lacked the financial resources to satisfy Fox's October 2012 settlement demand for $3.3 million or to continue its dispute with Admiral regarding coverage. [144] ¶ 61. This statement was not true. Wexford had hundreds of millions of dollars in revenue, and Wexford's manager of risk management (who

was consulted during the negotiations) has acknowledged that Wexford actually had the financial resources to pay Fox's $3.3 million demand. [144] ¶ 62.

Allocation manipulation, while not *per se* bad faith, also can be evidence of bad faith. *Johnson*, 221 Ill.App.3d at 109–10. The $14 million was allocated to correspond to specific types of damages, but the labels had little to do with the facts of the case. Fox's counsel, Michael Kanovitz, demanded the allocations as part of the consent agreement, and Wexford accepted the allocations without negotiation. [144] ¶ 56; [123] at 40. The allocations were: $3 million for emotional pain and suffering, $7 million for increased risk of premature death, and $4 million for punitive damages. [144] ¶ 56. Kanovitz selected $4 million in punitive damages based on his belief, through experience, that a jury would punish a corporation, like Wexford, with a larger verdict than they would with an individual. [144] ¶ 56; [123] at 40–41. Yet Fox conceded that the policies did not cover punitive damages; Wexford also has acknowledged that it did nothing meriting punitive damages. [144] ¶ 58. Kanovitz acknowledged that there was "no science behind [the] number" of $7 million for increased risk of premature death, but he had apparently intended to elicit testimony from Wexford's expert on cross regarding Fox's reduced life expectancy. [144] ¶ 56; [123] at 41–42. Based on Kanovitz's recollection, the $3 million for Fox's emotional pain and suffering from the date of injury through the date of parole may have been a remainder (after deciding—with no apparent basis—to put $7 million in the premature death category and $4 million toward punitive damages). [144] ¶ 56; [123] at 42. In Fox's January 2012 trial brief, Fox did not seek damages for

"increased risk of premature death" or for "emotional pain and suffering," but instead sought medical costs, past and future pain and suffering (physical and mental), and punitive damages. [144] ¶ 57.

Another allocation manipulation was Kanovitz's request to allocate the Becker-Peters settlement, which was previously an unallocated settlement. As part of the settlement with Wexford, Kanovitz requested Wexford to have Charysh change the Becker-Peters settlement terms to allocate the entire $3 million payment to Fox's medical care from October 2007 to October 2012. [144] ¶¶ 66–68. This allocation was aimed at avoiding a setoff to a jury verdict against the non-settling IDOC defendants and, in the event of a small award for Fox at trial, was aimed at reducing the likelihood that Admiral might avoid paying full coverage for a judgment by using a setoff. [144] ¶¶ 66–69. Wexford's counsel never requested any evidence of Fox's medical costs, and the medical liens for that time period that were levied against Fox's settlement payout totaled approximately only $260,000. [144] ¶¶ 68–69. Fox argues that he does not have the burden of showing that his allocations were reasonable. But ultimately, the reasonableness of the settlement allocations and the alteration to the Becker-Peters settlement bear on the reasonableness of Wexford's settlement, and whether a reasonably prudent uninsured defendant would have done the same. Of course, an uninsured defendant with sufficient assets would not conduct negotiations with an eye to manipulating insurance coverage, and this is a relevant circumstance to consider. When such factual issues are presented, summary judgment for Fox on the reasonableness of

Wexford's settlement is inappropriate. *See, e.g., Tracy's Treasures*, 2014 IL App (1st) 123339, ¶¶ 74–85.

Genuine issues of material fact also preclude summary judgment for Admiral. While there is evidence that the settlement was a collusive bargain motivated by the prospect of insurance coverage, there is also evidence in the record from which a fact-finder could find that a prudent uninsured might have settled before trial for $14 million. A prudent uninsured may have been concerned about the viability of its defense after the pretrial rulings—which denied all motions in limine and which permitted Fox to argue multiple theories at trial to establish his *Monell* claim—and after Becker and Peters settled out, particularly when Becker had previously indicated his resistance to testifying at trial. [141] ¶ 59; [132-6] at 29–30; [132-7] at 1–3. There is also evidence that in January 2012, Admiral and Charysh considered the chance of a defense verdict to be 50–60%, which could change depending on the pretrial rulings. [141] ¶¶ 56, 72. After the pretrial rulings were perceived by Admiral to largely favor Fox's case, the inference is that this percentage decreased. [141] ¶ 59; [132-6] at 29–30; [132-7] at 1–3.

The $14 million amount is not necessarily unreasonable, as a matter of law, given the severity of Fox's injury and resulting disabilities, the competing life care plan estimates ranging from $2.4 million (according to defendants' expert) to $11 million (according to plaintiff's expert), and the potential for an award of pain and suffering damages (which, at one point, Admiral acknowledged could be awarded at

up to double either of the life care plan estimates). [141] ¶¶ 66, 74; [132-7] at 28. Summary judgment, therefore, is inappropriate for Admiral on this issue.[20]

### D.    Duty of Good Faith

Fox seeks summary judgment, and payment of the consent judgment, for its claim that Admiral breached its duty to act in good faith towards Wexford by declining Fox's settlement offers in January, July, and October 2012. Admiral contends there was no breach because Wexford's coverage was depleted by the Becker-Peters settlement in August 2012, and, in the alternative, because its non-coverage position was reasonable and the Becker-Peters settlement created a beneficial setoff for any prospective judgment against Wexford.

An insurer has a duty to act in good faith in responding to settlement offers. *Haddick ex. rel. Griffith v. Valor Ins.*, 198 Ill.2d 409, 414–15 (2001). "If an opportunity appears to settle within the policy limits, thereby protecting the insured from excess liability, the insurer must faithfully consider it, giving the insured's interests at least as much respect as its own." *LaRotunda v. Royal Globe Ins. Co.*, 87 Ill.App.3d 446, 454 (1st Dist. 1980). If the insurer breaches its duty to act in good faith in responding to settlement offers, it may be liable for the entire

---

[20] Both Fox and Admiral offer competing experts, who opine on the strength (or lack thereof) of Fox's *Monell* claim against Wexford and on the range of potential jury awards faced by Wexford. *See, e.g.,* [141] ¶¶ 43, 45, 64–65, 67–69, 85. Admiral moves to strike Fox's experts, arguing that Fox's experts make inadmissible legal conclusions, impermissibly weigh evidence and determine the credibility of witnesses, and rely on hearsay. Genuine issues of material fact exist, however, regardless of both parties' proposed expert testimony on this issue. Their expert testimony is not stricken at this time, but it is not relied upon to determine whether genuine issues of material fact exist for summary judgment.

judgment against its insured—including any amount in excess of policy limits. *Haddick*, 198 Ill.2d at 414.

### 1. Existence of the Duty

To succeed on a duty-to-settle claim, a plaintiff must show that: (1) the duty to settle arose; (2) the insurer breached the duty; and (3) the breach caused injury to the insured. *Haddick,* 198 Ill.2d at 416. The duty to settle arises if a third-party claimant makes a settlement demand within policy limits and, at that time, there is a reasonable probability of liability in excess of the policy limits. *Id.* at 417. Whether a duty to settle in good faith exists under a particular set of facts is a question of law. *John Crane, Inc. v. Admiral Ins. Co.*, 2013 IL App (1st) 1093240-B, ¶ 34 (citing *Mt. Zion State Bank & Trust v. Consol. Commc'ns, Inc.*, 169 Ill.2d 110, 116 (1995)).

Admiral had a duty to respond in good faith to Fox's settlement offers. Fox's settlement demands were within the policy limits, and at the time they were made, there was a reasonable probability of liability in excess of the policy limits. The January 2012 settlement offer would have settled all claims against Becker, Peters, and Wexford for $5.99 million, [141] ¶ 71, which was within the policy limits. Around that time, Charysh (Wexford's trial counsel) believed that Wexford would "either win or lose big." [141] ¶ 72. Admiral and Charysh believed the probability of an adverse verdict against Wexford was around 40–50%, and with the risk possibly increasing depending on pretrial rulings. [141] ¶¶ 56, 72. Similarly, Admiral told Wexford that it believed a verdict would be an "all or nothing" proposition and estimated that an adverse verdict could range from $4.8 million to $22 million (reasoning that the jury might adopt either the defendants' expert's $2.4 million life

care plan estimate or Fox's expert's $11 million plan estimate, and then award a similar or greater amount for Fox's pain and suffering). [141] ¶¶ 66, 74; [132-7] at 28. Fox's July and October 2012 settlement offers (for lower amounts—in the ballpark of $3 million—and at a time when pretrial rulings made the risk of liability above policy limits even greater for Wexford), also triggered the duty to respond in good faith.[21]

### 2.    Breach of the Duty

Whether an insurer breached the duty to consider settlement offers in good faith is a question of fact, *Haddick*, 198 Ill.2d at 419. While an insurer can reject a bad deal, it must settle within policy limits if that would be "the honest and prudent course." *LaRotunda*, 87 Ill.App.3d at 454. Also, an insurer who exhausts policy limits in settlement for one insured without obtaining a release for another insured does not automatically breach its duty; it depends on the circumstances. *See Kirk v. Allstate Ins. Co.*, 2012 IL App (5th) 100573, ¶ 31; *Chicago Hosp. Risk Pooling Program v. Ill. State Med. Inter-Ins. Exch.*, 397 Ill.App.3d 512, 528 (1st Dist. 2010); *Country Mut. Ins. Co. v. Anderson*, 257 Ill.App.3d 73, 78–79 (1st Dist. 1993).

Considering factors pertinent to the assessment of bad faith—e.g., refusal to negotiate, advice of defense counsel, communication with the insured regarding settlement offers, a substantial prospect of an adverse verdict, the potential for damages to exceed the policy limits, *O'Neill v. Gallant Ins. Co.*, 329 Ill.App.3d 1166,

---

[21] In August 2012, Admiral indicated its belief that a plaintiff's verdict would exceed policy limits, and acknowledged its duty to respond to settlement demands in good faith. [141] ¶¶ 66, 74; [132-7] at 28.

1172–75 (5th Dist. 2002)—genuine issues of material fact preclude summary judgment on Fox's claim that Admiral breached its duty to settle. The evidence in the record suggests that Admiral actively engaged in negotiating settlements, even hiring another attorney to assist with settlement negotiations. [144] ¶ 36. Admiral also offered what it asserted to be the policy limits to settle all the insureds, although this offer was rejected by Fox ([145-10] at 21–22), and the record shows that Admiral regularly communicated with Wexford regarding settlement offers. Although Fox argues that Wexford was not fully included in all settlement discussions—specifically that Admiral turned down the July 2012 settlement offer without consulting Wexford—the evidence in the record suggests that Admiral did indeed discuss the July offer with Wexford, who may have left the decision to settle in Admiral's hands. [141] ¶¶ 73–74, 77; [132-8] at 18.

Evidence in the record also suggests that Admiral and Wexford were both aware that a verdict for Fox would likely meet or exceed policy limits, but that Admiral and Wexford both believed in the viability of Wexford's defense, although pretrial rulings caused Admiral and defense counsel concern as trial neared. Moreover, Admiral had other insureds to consider—Peters was demanding settlement, and Becker was reluctant to participate in the defense of the case—and Wexford did not express its position that additional coverage was available until October 2012. [141] ¶ 59; [144] ¶¶ 37, 45; [132-6] at 29–30; [132-7] at 1–2; [145-11]

at 54–55.[22] And while the Becker-Peters settlement did not include Wexford, it did provide Wexford with a $3 million setoff in the event of an adverse judgment at trial. [144] ¶ 38. When such material issues of fact are presented, summary judgment on the duty of good faith is inappropriate. *See, e.g., SwedishAmerican Hosp. Ass'n of Rockford v. Ill. State Med. Inter-Ins. Exch.*, 395 Ill.App.3d 80, 105 (2d Dist. 2010) (summary judgment on good-faith duty to settle inappropriate where record contained evidence that the probability of an adverse finding against the insured was high but also that the case was medically defensible and that the range of potential jury awards was wide ($0 to $65 million)).[23]

### E.    Setoff

The jury returned a $12 million verdict against Barnes, the remaining IDOC defendant at trial, and Barnes later settled with Fox for $12.43 million. Admiral argues that, as a matter of law, it is entitled to set off the amount that Fox has recovered through his settlements with Becker, Peters, and Barnes, for a total of $15.43 million. A setoff of this magnitude would relieve Admiral from paying the $14 million Wexford settlement.

Admiral is not entitled to a setoff, however, because the Wexford settlement (and consent judgment) was not an "adverse" judgment. Admiral relies on the

---

[22] Fox points out that during settlement discussions in January 2012, Wexford mentioned the potential for additional coverage. However, the record shows that Wexford did not advance an actual request for additional coverage until October 2012. [144] ¶ 45.

[23] Again, both Fox and Admiral offer competing experts on the strength (or lack thereof) of Fox's *Monell* claim against Wexford and on the range of potential jury awards faced by Wexford, and Admiral moves to strike Fox's experts. Because genuine issues of material fact exist regardless of both parties' proposed expert testimony on this issue, their expert testimony is neither stricken nor relied upon to decide the summary judgment motions.

Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2(c), which provides that "a settlement between one tortfeasor and the plaintiff will result in an equal setoff in amount against the recovery a nonsettling tortfeasor receives." *Pasquale v. Speed Prods. Eng'g*, 166 Ill.2d 337, 368 (1995). The Act was designed to prevent double recovery, which is against public policy in Illinois, and to protect the financial interests of non-settling parties in a settlement. *Id*. at 368–69. The Act and related case law apply to setoffs in circumstances where there are one or more prior settlements to be set off an adverse judgment for the non-settling party. *See id*.

The circumstances here are different: Barnes's settlement occurred after Wexford's settlement, not before. Also, the consent judgment against Wexford was not an "adverse" judgment on the merits; instead, it was "a court order that embodies the terms agreed upon by the parties as a compromise to litigation." *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002); *see id*. ("While a consent decree is also deemed a judgment of the court, 'it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all.'") (quoting *Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986)). If enforceable and collectible against Admiral, the Wexford settlement is not subject to a setoff under Joint Tortfeasor Contribution Act.

For the same reasons, Admiral cannot prevail on its argument that a setoff is necessary to avoid double recovery. The double recovery doctrine does not apply to settlements (or consent judgments embodying private settlement agreements) because the plaintiff's recovery flows from a negotiated contract, rather than an

adverse judgment. *See McMackin v. Weberpal Roofing*, Inc., 2011 IL App (2d) 100461, ¶ 32; *Kim v. Alvey, Inc.*, 322 Ill.App.3d 657, 672 (1st Dist. 2001); *In re Salmonella Litig.*, 249 Ill.App.3d 173, 183 (1st Dist. 1993); *see also Alshabkhoun*, 277 F.3d at 934.

Even if a plaintiff recovers more by settling with defendants than it may have recovered if all the parties had gone to trial, the double recovery rule is not implicated by such settlements, and courts will not second-guess such settlements absent evidence of bad faith. *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co.*, 522 F.3d 776, 788 (7th Cir. 2008). Which leads to Admiral's other argument that it is entitled to a setoff because the Wexford settlement was collusively designed to give Fox a windfall and to avoid setoffs. But Admiral's concern that the Wexford settlement was a collusive windfall for Fox really goes to the issue of whether the settlement was reasonable—a question that cannot be resolved at summary judgment.

## IV. Conclusion

For the foregoing reasons, the cross-motions for summary judgment [113] and [129] are denied.

ENTER:

Manish S. Shah
United States District Judge

Date: 2/5/16